

*17*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR-07-20037-VAR |
| Plaintiff, | HON. Victoria A. Roberts |
| -vs- | OFFENSE(S): 33 U.S.C. §1319(c)(2)(A), 18 U.S.C. §1001 |
| D-1, C O M P R E H E N S I V E E N V I R O N M E N T A L SOLUTIONS, INC. | MAXIMUM PENALTY: 5 years probation |
| | MAXIMUM FINE: $500,000, $50,000/day, the gain/loss, whichever is greater |
| Defendant. | |
| _____/ | |

## RULE 11 PLEA AGREEMENT

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, defendant COMPREHENSIVE ENVIRONMENTAL SOLUTIONS, INC. ("CESI"), by and through its authorized representatives, and the government agree as follows:

**1.    GUILTY PLEA**

**A.    Counts of Conviction**

CESI will enter a plea of guilty to **Counts 2 and 8** of the First Superseding Indictment, which charges: (1) a violation of a requirement of a U.S. Environmental Protection Agency ("EPA")-approved pretreatment program under the Clean Water Act ("CWA"); and (2) making a materially false statement in a matter within the jurisdiction of the EPA.

**B.**     <u>Elements of Offenses</u>

The elements of Count 2 are:

    (1)    That the defendant, by and through the actions of its agents and/or employees, knowingly violated a requirement of a pretreatment program; and

    (2)    That the program, at the time of the violation, was approved by the EPA.

The elements of Count 8 are:

    (1)    That the defendant, by and through the actions of its agents and/or employees, made a false statement in a matter within the jurisdiction of the EPA;

    (2)    That the defendant, by and through the actions of its agents and/or employees, acted willfully, that is deliberately and with knowledge that the statement was untrue; and

    (3)    The statement was material to the activities or decisions of the Detroit Water and Sewerage Department ("DWSD") an agency delegated by the EPA to enforce the Clean Water Act.

**C.**   **Factual Basis for Guilty Plea**

The following facts are a sufficient and accurate basis for CESI's guilty

pleas:

*Facility History*

CESI is a Nevada corporation that owns and operates a tank farm
consisting of about twelve above-ground tanks with a storage capacity of about
10 million gallons, located at 6011 Wyoming Avenue, Dearborn, Michigan
("the facility"). CESI was incorporated in about February 2002 for the purpose of
taking ownership of the facility and its assets from Rich Coast, Inc. ("RCI"), as
well as a portion of RCI's obligations. Before taking over the facility, CESI had no
physical plant, equipment, employees or business operations. Following
acquisition of the facility, CESI used the facility to accept, store, treat, recycle and
dispose of industrial wastes, primarily liquid wastes, received from customers.

RCI was a publicly held and traded Nevada corporation which owned and
operated the facility from about June 1997 to about March 2002. During most of
the relevant time-period, RCI operated the same type of business as CESI, using
the same facility. In about March 2002, RCI transferred the facility and its assets
to CESI, as a result of a transfer called a "Deed in Lieu of Foreclosure." Through
this transfer procedure, three secured interest holders – Capital Red Oak
Partners, Inc., Trans National Holding Limited, and I-Bankers Securities, Inc. –
acquired interest in the property and assets of RCI. Following the transfer, RCI
discontinued business operations and had no remaining property, machinery,
equipment, or inventory. Nearly all the employees of RCI who worked at the
facility in about March 2002 became employees of CESI immediately following
the transfer.

*Regulatory Background*

During the relevant time-period, the Detroit Water and Sewerage
Department ("DWSD") operated a publicly-owned treatment works ("POTW"),
which was authorized to discharge treated wastewater to the Detroit River in
accordance with a federal discharge permit. As a condition of its federal permit,
DWSD operated an EPA-approved pretreatment program. This program
included the City of Dearborn Wastewater Discharge Ordinance No. 92-533

(hereafter, the "Ordinance"), which allowed DWSD to (1) issue permits to "industrial users," businesses discharging wastewaters into the Detroit sewer system; (2) require industrial users that discharge wastewaters into the sewer system to periodically sample their effluent and report the results of such sampling to DWSD; and (3) enter permitted industrial user facilities and set up sampling equipment to ensure that those facilities are in compliance with applicable pretreatment requirements.  An industrial user violated the Ordinance if it failed to comply with any condition or requirement of its wastewater discharge permit.  Ordinance § 19-152(a)(4).  The Ordinance also incorporated the national pretreatment regulations promulgated by EPA.  Ordinance § 19-145(c).

During the relevant time-period, the RCI/CESI facility accepted liquid industrial wastes from third-parties for treatment and discharge to the DWSD's POTW.  From February 11, 1999 to March 28, 2002, the facility was authorized to discharge industrial wastewater to the Detroit sewer system in accordance with a series of wastewater discharge permits.  From about March 29, 2002 to about November 2002, the facility was authorized to discharge wastewater to the Detroit sewer system pursuant to DWSD Administrative Consent Order No. A-02-04.  Among other things, the discharge permits and consent order imposed limits on the concentrations of pollutants the facility could discharge to the sewer system.

In accordance with the discharge permits, the RCI/CESI facility was authorized to discharge designated types of "treated wastewater" to the sanitary sewer so long as those discharges occurred during normal business hours and did not exceed specified concentrations of various pollutants.  The permits contained schematic diagrams and other descriptions of how the facility treated its liquid wastes, including: (a) testing, sorting and storing incoming liquid wastes in designated tanks where gravity was used to separate oily waste from the wastewater; (b) transferring wastewater to a holding tank where additional oil was removed using temperature adjustments; (c) processing the wastewater further using the facility's treatment system, which removed pollutants by sending the wastewater through a series of chambers where it was treated by chemical flocculation (i.e., chemical precipitation of pollutants from solution), pH adjustment, clarification and sludge removal; (d) transferring the treated wastewater to a bio-reactor tank for biological treatment using microbial agents and air; (e) if necessary, treating the water in the carbon house using an activated carbon absorption system; and (f) directly metering and discharging the water to the sewer from the bio-reactor or after treatment in the carbon absorption units.

To ensure the treated wastewaters discharged to the sewer did not exceed the facility's pollutant limits, the discharge permits and the consent order required facility employees to collect "representative" compliance samples of the discharges from a sampling box located inside the facility's carbon house. The facility was required to report sampling analytical results to DWSD.

From about May 2001 to June 2002, DWSD officials periodically placed their own sampling equipment at the facility to verify the facility was complying with its discharge permits and the Ordinance. The Clean Water Act prohibited facility employees from tampering with or rendering inaccurate DWSD's monitoring devices, including its sampling equipment. 33 U.S.C. § 1319(c)(4).

The Ordinance and the national pretreatment regulations prohibited dilution as a means of achieving compliance. The national pretreatment regulations stated, "[n]o Industrial User shall increase the use of process water or, in any way, dilute or attempt to dilute a discharge as a partial or complete substitute for adequate treatment . . . ." 40 C.F.R. § 403.6(d); Ordinance § 19-145(d).

The national pretreatment regulations defined a "bypass" as the intentional diversion of wastestreams from any portion of an industrial user's treatment facility. 40 C.F.R. § 403.17(a)(1). Such bypassing was prohibited unless it did not cause a violation of a pretreatment standard or requirement and it was necessary for "essential maintenance." If both such conditions did not exist, a bypass was prohibited unless (1) it was unavoidable, (2) there was no feasible alternative to the bypass, and (3) the industrial user submitted proper notice to the appropriate authority. 40 C.F.R. §§ 403.17(b), 403.17(d). The discharge permits required the facility to notify DWSD within 24 hours of becoming aware of an unanticipated bypass of the pretreatment system, and, if possible, at least 10 days before an anticipated bypass. The national pretreatment regulations contained similar requirements. 40 C.F.R. § 403.17(c).

### Illegal Bypassing Activity

During the time-period relevant to this plea agreement, CESI employees frequently bypassed the facility's pretreatment system in order to discharge untreated liquid wastes directly to the sanitary sewer system. They did this in a number of different ways, including connecting flexible hoses from the facility's storage tanks to various points of entry to the sewer system located around the facility. On various occasions, facility employees took steps to conceal from

DWSD the true nature of discharges from the facility.   For example, facility employees told DWSD that the facility was not discharging on particular days when, in fact, the facility was discharging.

Former CESI management was aware of and condoned such by-passing activity.  In early 2001, the former president and chief executive officer of CESI became aware that the facility had no operable equipment to treat the liquid wastes the facility accepted.  In the Fall of 2001, this former executive was also notified that the facility's practice of mixing multiple wastes together in the large bulk tanks had created a mixture of wastes that would be very difficult to process effectively.  The former executive also learned that the facility's 10 million gallon tank farm was full, with virtually no capacity to store additional liquid wastes. Accordingly, the former executive understood that the facility could not accept additional wastes without discharging a corresponding amount of untreated material to the sewer system.  The former executive was advised that the facility should discontinue operation of its wastewater treatment process until it could achieve compliance with its DWSD discharge permit.

CESI did not shut down the facility, however.  Instead, in order to keep revenue coming in, CESI, with the knowledge of and  direction by its former top management team, permitted facility employees to continue to accept industrial waste-streams unabated.  From April 2001 to at least June 2002, CESI accepted approximately 13 million gallons of liquid wastes from third-parties for purported treatment and disposal.  Because the CESI facility had no space available for these incoming loads, nor equipment to treat the materials the former CESI senior managers understood that the facility by necessity discharged to the sanitary sewer all of this untreated liquid waste in violation of the pretreatment regulations, the facility's permit, and the consent order under which the facility operated.  Former CESI management and employees recognized that these practices were improper and illegal.

### False Statement

In about April 2002, CESI, through the actions of its employees, submitted, and caused to be submitted, an application to the DWSD for an industrial wastewater discharge permit for the facility in which a former senior CESI manager certified under penalty of law that, according to an analysis of the facility's wastewater discharge, "pretreatment standards [are] being met on a consistent basis[.]"  In truth and in fact, as CESI, through its former management,

employees and agents, well knew at the time, the facility's wastewater discharges were not meeting pretreatment standards on a consistent basis because the facility did not have an adequate treatment system and the facility's compliance samples were not representative of its actual discharges. CESI obtained a permit to discharge as a result of its false statements. Had CESI submitted an application that truthfully acknowledged that the facility was not meeting the pretreatment standards, it would not have obtained such a permit.

2.   **SENTENCING GUIDELINES**

   **A.      Standard of Proof**

   The Court will find sentencing factors by a preponderance of the evidence.

   **B.      Agreed Guideline Range**

   There are no sentencing guidelines disputes. Applicable guidelines for the sentencing of a corporate defendant are described in section 3, below.

3.   **SENTENCE**

   The Court will impose a sentence pursuant to 18 U.S.C. §3553, and in doing so must consider the sentencing guidelines for corporate defendants, described below.

   **A.      Fine**

   The parties understand and acknowledge that Chapter 8 of the United States Sentencing Guidelines is not applicable to the determination of the appropriate fine in this case. *See* U.S.S.G. § 8C2.1. The parties further agree that a fine amount of **$600,000** (coupled with the community services payments described below) is a reasonable and appropriate disposition of the matter.

- 7 -

Payment of the fine amount will consist of the following: (1) an initial deposit into the Court registry of $120,000 at the time of sentencing; (2) a second payment of $120,000 within one year of the judgment; (3) a third payment of $120,000 within two years of the judgment; (4) a fourth payment of $120,000 within three years of the judgment; and (5) a fifth payment of $120,000 within four years of the judgment.

**B.     Community Service**

The parties understand and agree that CESI will pay an additional **$150,000** in community service pursuant to U.S.S.G. § 8B1.3, and in furtherance of the sentencing principles provided in 18 U.S.C. § 3553(a), for the purpose of funding one or more projects for the benefit, preservation, and restoration of the environment and ecosystems in the waters of the United States adjoining the Rouge River and/or the Detroit River. The recipients and allocation of the community service payments will be finalized and submitted to the Court in advance of the sentencing hearing. Community service payments shall not be deducted from federal or state taxes as charitable contributions. Payment of the community service may be made in five installments of $30,000 each, as follows: (1) the first installment will be due at the time of sentencing; (2) the second installment will be due within one year of sentencing; (3) the third installment will be due within two years of sentencing; (4) the fourth installment will be due within

three years of sentencing; and (5) the fifth installment will be due within four years of sentencing.

### C.   Probation

The parties agree that an appropriate disposition of the case consists of a term of organizational probation for a period of five (5) years pursuant to the payment schedules above, and U.S.S.G. §§ 8D1.1 and 8D1.2.  The terms of probation shall include:

(1)   **No Further Violations**.  CESI agrees that it shall commit no further violations of federal, state or local law or regulations, and shall conduct all its operations in accordance with its wastewater discharge permit.

(2)   **Remedial Orders**.  On October 4, 2005, the Michigan Department of Environmental Quality ("MDEQ") and CESI entered a consent order relating to the cleanup of CESI's facility.  *In re Administrative Proceedings Against CESI,* WHMD Order No. 115-05-31-02-2005, AQD Order No. 35-2005.  As a condition of probation, and in accordance with U.S.S.G. § 8B1.2, CESI agrees to abide by the terms of that consent order, including agreeing to a new timetable and related amendment of the consent order for the cleanup of the facility.

(3)    **Environmental Management System/Compliance Plan**.

Consistent with the sentencing policies set forth in U.S.S.G. § 8D1.4, CESI

agrees to develop, adopt, implement and fund an Environmental

Management System/Compliance Plan ("EMS").  The EMS shall include an

annual program to train employees on environmental compliance and

ethics, which will ensure that all CESI employees understand the

requirements imposed by the facility's DWSD discharge permit.  CESI shall

be responsible for all costs associated with the development,

implementation, maintenance and monitoring of the EMS.  If CESI changes

its name, the renamed company shall be obliged to meet all of the

obligations of CESI under this agreement.  If CESI merges with another

company through a stock or asset purchase, or transfers ownership or

control of the facility, the newly created or merged company shall be

obliged to meet all of the obligations of CESI under this agreement with

regard to the facility.

(4)    **Funding Guarantees**.  To safeguard CESI's ability to pay any

deferred portion of the fines, penalties or community service projects, as

well as the funding of the consent order to cleanup the facility, CESI shall

(a) make periodic reports to the probation officer regarding CESI's financial

condition, (b) allow a reasonable number of examinations of its books and

records, and (c) notify the probation officer of any adverse change in CESI's business or financial condition, or commencement of any bankruptcy proceeding.  As a further assurance that CESI will adequately fund these various obligations, CESI's principal owner, Capital Red Oak Partners, Inc., agrees that it will submit forms (previously reviewed and approved by the government and the probation office) to the Court on or before the date of sentencing, which guarantee that any funding which is not provided by CESI or its successors or assigns, will be provided by Capital Red Oak Partners, Inc.

**D.     Special Assessment**

CESI will pay a special assessment of **$800** and must provide the government with a receipt for the payment before sentence is imposed.

**E.     Restitution**

The parties are not aware of identifiable victims entitled to restitution in this case.

**4.     COOPERATION AGREEMENT**

CESI agrees to assist the government in the investigation and prosecution of others involved in criminal activities, as specified below.

a.     Truthful Information and Testimony.  CESI will make its owners, officers, employees and agents (hereafter, "corporate agents")

available to provide information concerning all facts of this case known to them, including debriefings as requested by government and federal, state, and local law enforcement agencies.  CESI will make is corporate agents available to provide testimony at all proceedings, criminal, civil, or administrative, as requested by the government.  Such testimony may include, but is not limited to, grand jury proceedings, trials, and pretrial and post-trial proceedings.  CESI agrees to make its corporate agents available for interviews in preparation of all testimony.  CESI understands that this obligation to provide cooperation continues after sentencing and that failure to follow through constitutes a breach of this agreement.

      b.    <u>Nature of Cooperation.</u>  CESI agrees to cooperate in good faith, meaning that CESI will encourage its employees not only to respond truthfully and completely to all questions asked, but also to volunteer all information that is reasonably related to the subjects discussed in the debriefing.  CESI will notify the U.S. Attorney in advance if its corporate agents intend to offer a statement or debriefing to other persons other than CESI's attorney.  CESI is not prevented in any way from providing truthful information helpful to the defense of any person.  Any actions or statements inconsistent with continued cooperation under this agreement, including but not limited to criminal activity, or a statement indicating a

refusal to cooperate, or any other conduct which in any way undermines the effectiveness of CESI's cooperation, constitutes a breach of this agreement.

   c.   <u>Use of Information Against Defendant.</u>  In exchange for CESI's agreement  to cooperate with the government, as outlined above, the government agrees not to use new information that CESI provides (pursuant to this agreement) about CESI's own criminal conduct against CESI at sentencing in this case.  Such information may be revealed to the Court but may not be used against the CESI in determining CESI's sentence range, choosing a sentence within the range, or departing from the range.  There shall be no such restrictions on the use of information: (1) previously known to law enforcement agencies; (2) revealed to law enforcement agencies by, or discoverable through, an independent source; (3) in a prosecution for perjury or giving a false statement; or (4) in the event there is a breach of this agreement.

**5.   OTHER CHARGES**

If the Court accepts this agreement, the government will dismiss all remaining charges in this case against CESI.

**6.   EACH PARTY'S RIGHT TO WITHDRAW FROM THIS AGREEMENT**

The government may withdraw from this agreement if the Court finds the

- 13 -

correct guideline range to be different than is determined by Paragraph 2B.

CESI may withdraw from this agreement, and may withdraw its guilty plea, if the Court decides to impose a sentence higher than the maximum allowed by Part 3.  This is the only reason for which CESI may withdraw from this agreement.  The Court shall advise CESI that if it does not withdraw its guilty plea under this circumstance, the Court may impose a sentence greater than the maximum allowed by Part 3.

7.    <u>RIGHT TO APPEAL</u>

If the sentence imposed does not exceed the maximum allowed by Part 3 of this agreement, CESI waives any right it has to appeal its conviction or sentence.  If the sentence is consistent with the provisions set forth in Part 3, the government agrees not to appeal the sentence, but retains its right to appeal any sentence inconsistent with Part 3.

8.    <u>CONSEQUENCES OF WITHDRAWAL OF GUILTY PLEAS OR VACATION OF CONVICTIONS</u>

If CESI is allowed to withdraw its guilty pleas or if any conviction entered pursuant to this agreement is vacated, the Court shall, on the government's request, reinstate any charges that were dismissed as part of this agreement.  If additional charges are filed against CESI within six months after the date the order vacating CESI's conviction or allowing it to withdraw its guilty pleas

becomes final, which charges relate directly or indirectly to the conduct underlying the guilty pleas, CESI waives its right to challenge the additional charges on the ground that they were not filed in a timely manner, including any claim that they were filed after the limitations period expired.

9.     **PARTIES TO PLEA AGREEMENT**

Unless otherwise indicated, this agreement does not bind any government agency except the United States Attorney's Office for the Eastern District of Michigan and the United States Department of Justice's Environmental Crimes Section.

10.    **CORPORTATE AUTHORIZATION**

CESI represents that it is authorized to enter into this agreement.  On or before the date of entry and filing of the plea agreement, CESI shall provide to the government and the Court a written statement under corporate seal, certifying that CESI is authorized to enter into and comply with all of the provisions of this plea agreement.  The resolutions further shall authorize CESI's counsel to take these actions, and that all corporate formalities for such authorizations have been observed.

11.    **SCOPE OF PLEA AGREEMENT**

This agreement, which includes all documents that it explicitly incorporates, is the complete agreement between the parties.  It supersedes all other promises,

representations, understandings, and agreements between the parties concerning the subject matter of this plea agreement that are made at any time before the guilty plea is entered in court.  Thus, no oral or written promises made by the government to CESI or to the attorney for CESI at any time before CESI pleads guilty are binding except to the extent they have been explicitly incorporated into this agreement.

This agreement does not prevent any civil or administrative actions against CESI, or any forfeiture claim against any property, by the United States or any other party.

**11.** **ACCEPTANCE OF AGREEMENT BY DEFENDANT**

This plea offer expires unless it has been received, fully signed, in the

Office of the United States Attorney by **5:00 P.M. on 9/4/2008**. The government

reserves the right to modify or revoke this offer at any time before CESI pleads

guilty.

TERRENCE BERG
Acting United States Attorney

RONALD J. TENPAS
Assistant Attorney General

LYNN HELLAND
ASSISTANT UNITED STATES ATTORNEY
CHIEF, SPECIAL PROSECUTIONS UNIT

JAMES MORGULEC
SENIOR COUNSEL
UNITED STATES DEPARTMENT OF
JUSTICE, ENVIRONMENTAL CRIMES
SECTION

MARK CHUTKOW
ASSISTANT UNITED STATES ATTORNEY

DATE: 9/4/2008

BY SIGNING BELOW, DEFENDANT ACKNOWLEDGES THAT IT HAS READ (OR BEEN
READ) THIS ENTIRE DOCUMENT, UNDERSTANDS IT, AND AGREES TO ITS TERMS. IT ALSO
ACKNOWLEDGES THAT IT IS SATISFIED WITH ITS ATTORNEY'S ADVICE AND
REPRESENTATION. DEFENDANT AGREES THAT IT HAS HAD A FULL AND COMPLETE
OPPORTUNITY TO CONFER WITH ITS LAWYER, AND HAS HAD ALL OF ITS QUESTIONS
ANSWERED BY ITS LAWYER.

BY: Thomas W. Cranmer

ITS: Attorney

THOMAS W. CRANMER
ATTORNEY FOR DEFENDANT

COMPREHENSIVE ENVIRONMENTAL
SOLUTIONS, INC.
DEFENDANT

DATE: 9/4/2008