UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,               CASE NUMBER: 07-20037-1
                                       HONORABLE VICTORIA A. ROBERTS

v.

COMPREHENSIVE ENVIRONMENTAL
SOLUTIONS, INC.,

                    Defendant.

_____/

**MEMORANDUM OPINION**

## I.    INTRODUCTION

Defendant Comprehensive Environmental Solutions, Inc. ("CESI") comes before the Court to be sentenced for violating the Clean Water Act. Probation recommends the sentence set forth in CESI's Plea Agreement, namely a fine of $600,000, a community service project contribution worth $150,000, five years probation, and a special assessment of $800.

At the sentencing hearing on June 22, 2009, CESI was represented by counsel and by Alan Moore, the president of its principal owner, Capital Red Oak Partners, Inc. ("CROP"). The parties generally agree the Plea Agreement sentence is reasonable. However, CESI argues its financial condition is so precarious it may not be able to pay the fine. The Government requests the Court place a judgment lien on CESI's assets, in case the company does not survive long enough to pay the fine.

The Court sentences CESI in accordance with the Plea Agreement and allows the Government to file a judgment lien against CESI's property.

## II.    BACKGROUND

CESI operates an industrial waste treatment, storage and disposal facility in Dearborn, Michigan.  This "tank farm" operates under a permit from the Detroit Water and Sewerage Department ("DWSD"), which requires that liquid wastes be treated according to a multi-step process aimed at removing oils and other industrial residue. Clients pay CESI to take their wastewater and reduce chemicals or other contaminants to acceptable levels, at which point the remaining water can be discharged legally into the municipal sewer for treatment by a publicly-owned treatment works ("POTW").

CESI acquired the tank farm in March 2002 from Rich Coast, Inc. ("RCI"), the facility's owner and operator since 1997.  RCI's principal shareholder was a company named Trans National; after CESI took over, Trans National and CROP each owned about 49% of the new business.  Over time, CROP increased its equity interest in CESI, while Trans National converted its interest into debt.  Eventually, CROP became CESI's principal owner and shareholder, and Trans National its junior lienor.  CROP currently owns about 80% of CESI, with the remainder divided between Trans National and seven or eight smaller shareholders.

### A.    Offense Conduct

On June 17, 2002, federal and state law enforcement agents raided CESI on suspicions that, over a period of about 14 months between 2001 and 2002, the facility dumped millions of gallons of untreated industrial liquid waste into the sewers.  Agents arrested four employees, all of whom worked for RCI before CESI took over: Donald A. Kaniowski, Charles D. Long, Bryan S. J. Mallindine and Michael G. Panyard.  These

individuals eventually pled guilty or were convicted by jury of violating the Clean Water Act ("CWA").

In a First Superseding Indictment filed July 12, 2007, a grand jury charged CESI with bypassing CWA pretreatment requirements, in violation of 33 U.S.C. § 1319(c)(2)(A) (Count II); rendering inaccurate DWSD monitoring devices or methods, in violation of 33 U.S.C. § 1319(c)(4) and 18 U.S.C. § 2 (Counts III-IV); making false statements, in violation of 18 U.S.C. §§ 1001 and 2 (Counts V-X and XII); obstructing justice, in violation of 18 U.S.C. §§ 1512(b)(2)(B) and 2 (Count XI); and conspiring to commit all the above, in violation of 18 U.S.C. § 371 (Count I).  The maximum penalty for each count is five years probation, and a fine of either $500,000 or twice the total gain or loss resulting from the violation, whichever is greater.  18 U.S.C. § 3571(c), (d).

### B.    Plea Agreement

On September 4, 2008, CESI and the Government signed an agreement pursuant to Fed. R. Crim. P. 11 ("the Plea Agreement").  CESI pled guilty to Counts II and VIII of the First Superseding Indictment, in exchange for a sentence composed of a financial penalty and five years probation.

The financial component consists of: (1) a $600,000 fine; (2) a $150,000 community service project contribution to fund the preservation and restoration of the environment and ecosystems affected by illegal discharges; and (3) an $800 special assessment pursuant to 18 U.S.C. § 3013(a)(2)(B).  All funds are guaranteed by CROP, and except for the special assessment, which is due at sentencing, they are payable in five equal installments over four years.

The terms of probation require CESI to: (1) comply with federal, state and local

laws, and operate in compliance with the terms of its wastewater discharge permit; (2) abide by the terms of a consent order entered with the Michigan Department of Environmental Quality ("MDEQ") on October 4, 2005, concerning the facility's cleanup; (3) develop, adopt, implement and fund a plan to train employees on compliance and ethics with regards to its discharge permit; and (4) make periodic reporting of its financial condition, give access to its books, and notify Probation of any adverse change in its business or financial condition.  CROP also guarantees all funds necessary to fulfill CESI's probation obligations.

### C.    Dispute over CESI's Assets

In 2008, after several years without involvement in CESI's affairs, Trans National sued the company for failing to repay certain loans.  In December 2008, the Circuit Court for Wayne County awarded Trans National $2.4 million.  CROP reacted by foreclosing on CESI's real estate, thereby securing its investments and priority status as senior lienor.  CROP also sought to foreclose on CESI's assets, but the procedure was stayed when Trans National laid claim to the facility and equipment.  Facilitation is scheduled between CROP and Trans National to resolve their dispute over CESI's assets.

## III.    APPLICABLE LAW

A sentencing court bears a statutory duty to fashion a sentence that is "sufficient, but not greater than necessary," and which appropriately serves:

(A) to reflect the seriousness of the offense, to promote respect for the
    law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and

4

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Typically, a sentencing court begins its analysis by determining the sentence prescribed by the United States Sentencing Commission Guidelines ("U.S.S.G." or "the Guidelines"). *Gall v. United States*, 128 S. Ct. 586, 596 (2007) ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range") (*citing Rita v. United States*, 127 S. Ct. 2456, 2480 (2007)). However, the Guidelines are of no assistance when sentencing corporate defendants convicted of offenses involving the environment. *See* U.S.S.G. § 8C2.1 cmt. background (2008). Instead, courts must apply the provisions of 18 U.S.C. §§ 3553 and 3572 to determine the proper fine. U.S.S.G. § 8C2.10.

The factors of 18 U.S.C. § 3553(a) must be considered whenever a court imposes sentence. They include: the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the Guidelines sentencing range; pertinent policy statements by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records and found guilty of similar conduct; and the need to provide restitution to any victims of the offense. § 3553(a). The court need not expressly state each factor at sentencing, as long as its opinion reflects their consideration. *United States v. Mayberry*, 540 F.3d 506, 518 (6th Cir. 2008) (*citing United States v. Moon*, 513 F.3d 527, 539 (6th Cir. 2008)).

In contrast with 18 U.S.C. § 3553, section 3572 applies only to sentences which

5

include a fine component.  It states:

> In determining whether to impose a fine, and the amount, time for
> payment, and method of payment of a fine, the court shall consider, in
> addition to the factors set forth in section 3553(a) --
>
> (1) the defendant's income, earning capacity, and financial resources;
>
> (2) the burden that the fine will impose upon the defendant, any person
> who is financially dependent on the defendant, or any other person
> (including a government) that would be responsible for the welfare of
> any person financially dependent on the defendant, relative to the
> burden that alternative punishments would impose;
>
> (3) any pecuniary loss inflicted upon others as a result of the offense;
>
> (4) whether restitution is ordered or made and the amount of such
> restitution;
>
> (5) the need to deprive the defendant of illegally obtained gains from the
> offense;
>
> (6) the expected costs to the government of any imprisonment, supervised
> release, or probation component of the sentence;
>
> (7) whether the defendant can pass on to consumers or other persons the
> expense of the fine; and
>
> (8) if the defendant is an organization, the size of the organization and any
> measure taken by the organization to discipline any officer, director,
> employee, or agent of the organization responsible for the offense and
> to prevent a recurrence of such an offense.

§ 3572(a).

In crafting its judgment, the court must consider any argument by the defendant

to adjust or reduce its sentence:

> When a defendant raises a particular argument in seeking a lower
> sentence, the record must reflect both that the district judge considered
> the defendant's argument and that the judge explained the basis for
> rejecting it.  After considering such arguments, the district judge . . . "must
> make an individualized assessment based on the facts presented."
> Finally, the district judge "must adequately explain the chosen sentence to
> allow for meaningful appellate review and to promote the perception of fair
> sentencing."

*United States v. Lalonde*, 509 F.3d 750, 770 (6th Cir. 2007) (*quoting Gall*, 128 S. Ct. at

597) (other quotations omitted).

6

A sentence must be both procedurally and substantively reasonable.  *Gall*, 128 S. Ct. at 597.  A district court commits procedural error if it disregards relevant § 3553(a) factors, relies on clearly erroneous facts, or fails to adequately explain its reasons for choosing a particular sentence.  *Id.*; *see also United States v. Dexta*, 470 F.3d 612, 614-15 (6th Cir. 2006) ("[A] sentence is procedurally reasonable if the . . . court addressed the relevant factors in reaching its conclusion.  . . . [P]rocedural reasonableness . . . does not depend on a district court's engaging in a rote listing or some other ritualistic incantation of the relevant § 3553(a) factors") (internal citations omitted).  By contrast, "[a] sentence is substantively unreasonable if the district court 'selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent § 3553(a) factors or gives an unreasonable amount of weight to any pertinent factor.'"  *United States v. Husein*, 478 F.3d 318, 332 (6th Cir. 2007) (*quoting United States v. Caver*, 470 F.3d 220, 248 (6th Cir. 2006)).

On appeal, sentences are reviewed for abuse of discretion.  *Gall*, 128 S. Ct. at 594 (*citing United States v. Booker*, 543 U.S. 220, 260-62 (2005)).

## IV.    ANALYSIS

Since the Guidelines do not apply, there is no offense level computation, base fine calculation, culpability score assessment, or fine range.  The Court's analysis begins and ends with the factors of 18 U.S.C. §§ 3553 and 3572.  U.S.S.G. §§ 8C2.1, 8C2.10.

CESI does not dispute the reasonableness of the Plea Agreement sentence under 18 U.S.C. § 3553, but argues that given its precarious financial situation, a $600,000 fine would not comport with the § 3572 factors.  CESI explains its condition

7

deteriorated so much since the Plea Agreement that it plans to terminate all business operations.

The Government opposes reducing the fine, because CESI's financial condition was factored into the Plea Agreement.  Moreover, citing the imminent cessation of CESI's business operations and the need to guard against default, the Government asks the Court to impose a sentence that takes into account the essential terms of the Plea Agreement, but to also include in the Judgment of Sentence terms that would: (1) allow a judgment lien to be placed on CESI's property; (2) accelerate payment of the fine and community service project contribution; and (3) designate CROP's corporate parent, Texas-based private equity firm Red Oak Capital ("ROC"), as CESI's guarantor (ROC also serves as a d/b/a/ entity for Alan Moore).

Of these proposed amendments, the Court considers only the first.  The Government cites no authority to substitute the guarantor of a criminal sentence, and the Court declines to do so.  As for expediting payments, the Government withdrew its request at the sentencing hearing, when Mr. Moore declared that neither he, CESI, nor CROP has the means to satisfy judgment on an accelerated basis.

### A.    18 U.S.C. § 3553(a) Factors

Both parties believe the sentence set forth in the Plea Agreement is reasonable given the seriousness of the offense, and CESI's efforts to rectify the consequences of its conduct and prevent future violations.  The Court agrees.

### 1.    Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

With respect to Count II, the Plea Agreement states that, from at least April 2001

8

to June 2002, CESI's employees bypassed the facility's pretreatment system in order to discharge untreated wastes directly into the sanitary sewer, and that management was aware of and condoned these activities.  Moreover, employees and management concealed discharges from DWSD and other regulatory authorities, and made repeated false statements to regulators and investigators.  As a result, at least 13 million gallons of oily wastes and other liquid industrial residue were dumped into the sewer during the indictment period.

As for Count VIII, the parties stipulate that CESI, through the actions of its staff, submitted an industrial wastewater discharge permit application to DWSD, in which a company manager certified under penalty of law that pretreatment standards were being met on a consistent basis.  As a result of this application, DWSD granted CESI a discharge permit, enabling the facility to continue receiving millions of gallons of waste it could not properly treat.

The Court had many opportunities to reflect on the seriousness of these crimes.  One former CESI employee pled guilty to violating CWA pretreatment requirements, and three other former managers or employees went to trial.  Two were convicted of nine felonies; one was convicted of a misdemeanor.  Trial evidence revealed that managers at the highest level knew illegal discharges were taking place, yet ignored or condoned them to make room for new shipments.

CESI argues these acts occurred over seven years ago, and involved non-hazardous wastes dumped into the sewers, not into the environment.  This does not detract from the seriousness of the offense.  The CWA creates a network of specialized treatment facilities, each designed to process certain types of waste.  The entire system

depends on each facility completing its part of the treatment process: if a pretreatment facility like CESI fails to remove oils and other industrial wastes from the water stream, this inevitably affects the functioning of POTWs downstream.  Thus, the remoteness of an offense and its lack of damage to the environment do not mean that the system as a whole did not suffer the consequences of CESI's offenses.  In a framework which relies on self-policing, such factors cannot be treated as mitigating.

To its credit, CESI acknowledges the seriousness of its offenses, and understands that just punishment is necessary to promote respect for the law.  The Court agrees the Plea Agreement sentence adequately fulfills these purposes.

### 2.    Defendant's History and Characteristics

While acknowledging the seriousness of its offenses, CESI submits they occurred in "a dark and distant past."  As evidence of its commitment to reform, the company cites its decision to replace senior management in 2005, after the raid occurred but before this case was charged.

CESI asserts that, between 2005 and 2008, it raised millions of dollars to improve equipment and facilities, enhance third-party oversight, and properly dispose of all wastes.  In 2005, CESI conducted a comprehensive survey of the so-called "historic" wastes accumulated on site, after which it began the process of eliminating them.  The company says its efforts were rewarded in 2006, when DWSD issued a revised discharge permit relaxing previously imposed restrictions.  In its April 2009 sentencing memorandum, CESI claimed to have reduced the tank farm's volume by 97%, with only 300,000 gallons of historic waste remaining; at the June 22 hearing, Mr. Moore declared the cleanup complete.

10

The Government does not question the sincerity of CESI's commitment to remedy its offenses, discipline employees and clean up the facility, and asserts these measures greatly reduced the Plea Agreement's fine recommendation.

The Court finds the Plea Agreement sentence properly reflects CESI's voluntary efforts to bring itself into compliance.

### 3.    Need to Afford Adequate Deterrence

When applied to sentencing, the concept of deterrence has two components. The first deals with deterring crimes by individuals or entities similarly situated to the defendant; it favors exemplary sentences, so that one's punishment may serve as a warning to others.  The second aspect focuses on recidivism by the same person or business; it supports sentences tailored to individual circumstances and just severe enough to ensure a company will not commit other crimes in the future.

CESI submits that its risk of committing future crimes against the environment is very low, as evidenced by its commitment to compliance and oversight.

The Court agrees CESI efforts to remedy its prior failings make it an unlikely candidate for recidivism.  However, the Court must also consider another aspect of deterrence – discouraging others in similar positions from engaging in similar crimes. This is a particular concern for environmental and white-collar crimes, because they are often perceived as carrying substantially lesser punishment than other comparable offenses.  For this reason, the Court believes the Plea Agreement sentence is appropriate.

### 4.    Need to Protect the Public and Provide the Most Effective Form of Educational or Corrective Sentence

The Court finds the Plea Agreement sentence protects the public by requiring CESI to abide by federal, state and local regulations and the October 2005 consent order with MDEQ.

The Court also holds the Plea Agreement properly balances the punishment and correctional purposes of sentencing.  Aside from paying a fine, CESI must develop and implement an environmental management compliance plan, and train employees to understand and comply with the requirements of its discharge permit.  This aspect of the sentence fulfills an educational and training purpose.  Finally, CESI must contribute $150,000 to fund initiatives improving the environmental conditions of local waterways, thus enhancing CESI's relationship with the surrounding community.  This component serves an element of restitution as well: although there were no identifiable victims, CESI's conduct damaged public infrastructures and facilities, and betrayed the public trust.  It is important that CESI's sentence acknowledge and compensate for this harm.

### 5.        Pertinent Policy Statements by the Sentencing Commission

It is an undeniable fact that sentences for environmental crimes are often more lenient than for other, comparable offenses.  This in turn contributes to a general sense that such crimes as less serious than others.

To address this misconception, the Sentencing Commission purposefully raised the guidelines for crimes against the environment.  *See United States v. Hagerman*, 525 F. Supp. 2d 1058, 1065 (S.D. Ind. 2007) ("The Sentencing Commission['s decision] to set higher guidelines for environmental offenses . . . was consistent with the general instructions from Congress to raise sentences for white-collar economic crimes, especially for purposes of deterrence.  *See* S. Rep. No. 98-225, at 76 (1983), as

reprinted in 1984 U.S.C.C.A.N. 3182, 3259 (noting that 'major white collar criminals often are sentenced to small fines and little or no imprisonment,' creating the impression that 'certain offenses are punishable only by a small fine that can be written off as a cost of doing business')").

The fact that the Guidelines do not factor in CESI's sentencing does not diminish the validity of the Commission's observation. The Court's sentence must attend to the need to resolve the disconnect between penalties in environmental crimes and others.

### 6.      Types of Penalties Available

CESI submits that the Plea Agreement sentence is not only reasonable but comprehensive, with a fine, a contribution to community service projects, and several compliance mechanisms. However, CESI describes the $600,000 fine as a "significant amount of money" given that the CWA's fine structure starts at $5,000 and that a false statement conviction carries a maximum fine of $500,000.

The Government agrees overall that the sentence is reasonable. However, the Government emphasizes $600,000 is small when considering CESI could have been fined up to $6 million if found guilty on each count, *see* 18 U.S.C. § 3571(c)(3), and perhaps up to $9 million under the Alternative Fines Act, § 3571(d). The Government submits this as evidence of the fine's reasonableness, and of the fact that CESI's financial posture was a big factor during Plea Agreement discussions.

The Court notes that if the tank farm closes, CESI will not be subject to its probation obligations, including complying with the MDEQ Consent Order, training employees, and building a corporate culture that follows the law and encourages ethical conduct. This eventuality argues against waiving or reducing the fine. Otherwise, if it

13

ceases to exist, CESI's only punishment will be the $150,000 contribution to community service projects, an amount wholly inconsistent with the seriousness of its offenses.

The Court finds the $600,000 fine to be reasonable.

### 7.   Appropriateness of Sentence under 18 U.S.C. § 3553(a)

The Court finds the Plea Agreement sentence sufficient, but not greater than necessary, to meet the sentencing purposes set forth in 18 U.S.C. § 3553(a).

### B.   18 U.S.C. § 3572(a) Factors

The 18 U.S.C. § 3572(a) factors apply only to the fine component of the Plea Agreement sentence.

CESI argues the economic downturn renders a $600,000 fine unreasonable, and that given its financial state, the fine will unreasonably burden the company or, more likely, the corporate parent who will have to contribute the funds.

The Government opposes any fine reduction and argues the Plea Agreement accounts for CESI's financial state, which was well-known during plea negotiations.

### 1.   Defendant's Income, Earning Capacity and Financial Resources

CESI explains that, since pleading guilty, its financial situation deteriorated so much it plans to terminate business operations.  CESI says it did not turn a profit since 2002, and suffered over $15.3 million in net operating losses during the same period. In 2008, its worst year, the company lost over $3.3 million, and revenues continued to decline in 2009.  CESI's financial data indicates its fourth quarter revenues dropped 41%, from $1.27 million in 2007 to $750,000 in 2008.  First quarter revenues registered a 58% loss, from $1.68 million in 2008 to $700,000 in 2009.  CESI attributes this decline

14

to the global economic downturn, which caused customers to reduce waste production and default on accounts.  Adding to CESI's woes is the recent $2.4 million judgment obtained by its junior lienor, Trans National.

As CESI describes it, the company has no cash on hand, no assets to draw on until the economy recovers, and all its property was pledged to secure loans to fund its operations.  As a result, CESI plans to stop accepting incoming wastes and does not project any new revenue streams.

The Government responds that what CESI portrays as an unreasonable fine is, in fact, a steeply discounted penalty.  According to the Government, most of the financial data on which CESI relies was available during plea discussions, including Trans National's then-pending lawsuit.  The Government asserts that concern about CESI's ability to pay was the main contributing factor in reducing the fine from $6 million to $600,000.  The Government acknowledges that CESI's efforts to improve its practices and remedy past wrongs also helped lower the fine, but submits further reduction would be inappropriate.

The Court is inclined to agree with the Government.  CESI pled guilty in September 2008, when the severity of the global recession was already established. The company had lost substantial amounts of money every year of its existence, and was fully aware of its precarious condition, yet it voluntarily signed the Plea Agreement. The further deterioration of its finances was therefore not a surprise, and cannot weigh in favor of adjusting or reducing the fine.

### 2.    Burden of a Fine on Defendant

CESI argues a $600,000 fine would cause an undue burden on its principal

15

shareholder, CROP, which will likely have to pay the fine.  "The defendant bears the burden of proof regarding her inability to pay a fine."  *United States v. Thomas*, No. 06-6019, 2008 U.S. App. LEXIS 7728, at *27 (6th Cir. April 4, 2008) (unpublished) (*citing United States v. Ukomadu*, 236 F.3d 333, 340 (6th Cir. 2001)).

CESI appears to argue CROP lost enough money in this venture already, and that it would be unreasonable to require it to pay an additional $600,000.  As CESI's primary shareholder, CROP lent the company over $17.4 million since 2002.  These funds were primarily aimed at maintaining operations and bringing the facility into compliance with environmental laws and regulations, but $2.5 million were used to clean up historic wastes for which CROP was not responsible.  CESI submits CROP has lost hope of recovering more than a fraction of its investment, and even this will be difficult given Trans National's competing claims.

The Government submits CESI still has inherent value in its land and buildings, and argues it would not be right for CROP or another entity to profit from selling these assets without paying the fine.

The Court appreciates CROP's efforts to keep CESI operational while, at the same time, upgrading its infrastructure, bringing the facility into compliance, and cleaning up residual wastes.  Clearly, CROP lost a considerable amount of money trying to shore up CESI.  However, there is no indication CROP would have acted differently if it had known CESI would eventually face a $600,000 fine.

The Court holds the fine will not place an undue burden upon CROP.  The fact that CROP's investments did not work out as planned does not absolve CESI of its debt to the United States.

### 3.    Pecuniary Losses Caused to Others and Restitution

CESI claims it is not aware of any pecuniary loss inflicted upon others.  The

company appears to suggest its conduct could not have caused such damage, because

the wastes in question were non-hazardous and were discharged into the municipal

sewer instead of into the environment.  Furthermore, CESI argues, any damage caused

will be adequately remedied by the $150,000 the company is required to contribute to

community service projects aimed at cleaning up the surrounding waterways.

The lack of recorded damage to the environment does not mean that other

entities did not suffer pecuniary damages.  For instance, it is not unreasonable to

surmise that the influx of oily wastewater created an additional burden on the POTW

that eventually processed CESI's discharges, perhaps slowing the treatment process,

consuming more chemicals, or causing filters to clog and require faster replacement.

Naturally, the costs of these inefficiencies would be borne by the public.

Moreover, enforcing environmental laws is an expensive task, which is entirely

borne by taxpayers.  It is only appropriate that individuals and corporations who violate

these laws also contribute to their enforcement, if they can afford to do so.

The fact that the damage caused by CESI's actions was not quantified does not

eliminate the fine's rationale, nor does the requirement to contribute $150,000 to

community service projects.

### 5.    Need to Deprive Defendant of Illegally Obtained Gains

CESI submits there are no illegal gains to disgorge, because any profit from

discharging untreated wastes was more than offset by the millions of dollars invested to

reform the company, which there is little hope to recover.

The Government counters it would not be appropriate for CESI or its creditors to benefit from selling the company without paying the criminal judgment for its dumping activities.  The Government seems to argue that CESI's cleanup efforts benefitted from prior illegal discharges.

Since there are no undue profits to disgorge, this factor does not support a fine. Even if CESI's 2002 discharges lowered the expense of cleaning the site seven years later, it is highly unlikely these savings exceeded the amount of money invested by the firm's corporate parents.

### 6.     Expected Costs to the Government, and Whether Defendant can Pass to Consumers the Expense of the Fine

CESI argues that, since it intends to close operations soon, the Government's oversight expenses will be minimal.  Likewise, since the company is no longer accepting incoming waste streams, it cannot pass the costs of a fine to its clients.  The Court has no reason to doubt CESI's assertions; this factor weighs against the fine.

### 7.     Size of the Company, and Whether Measure were Taken to Discipline Employees Responsible and Prevent a Recurrence

CESI explains it currently employs 18 people, down from its peak of 31, and that none of the officers responsible for its offenses is still with the company.  As discussed earlier, the company made substantial investments to revamp its operations and train employees to avoid repeating prior mistakes.  This factor weighs against a fine.

### 8.     Appropriateness of Sentence under 18 U.S.C. § 3572(a)

The Court holds that, on balance, the 18 U.S.C. § 3572(a) factors support the

imposition of a fine, and that the proposed $600,000 amount is sufficient, but not greater than necessary, to meet the sentencing purposes of § 3572(a).

### C.   Request for Judgment Lien

The Government argues CESI poses a high risk of defaulting on its sentence, and requests the Court to allow a judgment lien to be placed on its property.

At the hearing, Mr. Moore explained CESI and CROP lack options to guarantee payment of the company's sentence.  CESI's assets and property are in foreclosure, the company has no cash reserves or revenue streams.  CROP hopes to recover a portion of its investment by selling the property and any asset not claimed by Trans National.  CROP claims it does not intend to place CESI in bankruptcy, but Trans National or another creditor could file an involuntary bankruptcy petition when the facility shuts down.  Mr. Moore asserts he is contemplating personal bankruptcy.

According to its balance sheet, CESI was worth about $7.5 million in 2006, $3.2 million for the buildings and $4.3 million for the land.  However, Mr. Moore believes the land alone is unlikely to fetch more than $3 million in the current economic climate.

The Government expects that, with CESI's closure imminent, the company's remaining assets will soon be partitioned between its creditors, who will then sell their respective allotments to the highest bidder.  The Government submits this is why Trans National re-emerged after years of silence to claim its share of CESI.  The Government claims the timing of Trans National's lawsuit is particularly suspicious, because CESI is close to eliminating all remaining historic wastes.  These wastes are CESI's biggest liability, and their disposal increases the facility's value to potential buyers.  According to the Government, this explains Trans National's renewed interest in the company.

The Government submits it is very unlikely CESI will pay the fine or community service project contribution before it is partitioned and sold. If this happens, the Government fears it will be nearly impossible to recover the judgment from CESI's former creditors. According to CROP, Trans National is an off-shore entity based in the Isle of Man, a fiscal paradise located in the Irish Sea. As for CROP itself, the Government says it has no assets other than CESI and is entirely dependant on ROC for its income and capital. The Government suggests CROP may be a "shell company," the sole purpose of which is to insulate the real party in interest, ROC, from CESI's liabilities.

The Court finds the Government's concern is warranted, and supports the filing of a judgment lien against CESI's property. The Court also notes that Trans National, who was RCI's principal shareholder during the offense and availed itself of Michigan courts for its suit against CESI, should be held accountable for its share of the company's liabilities.

### D. Recipient of Community Service Project Contribution

The Government asks the Court to designate the International Wildlife Refuge Alliance ("the Alliance"), to receive CESI's $150,000 community service project contribution. The Government submits the Alliance is a respected 501(c)(3) non-profit organization dedicated to helping the United States Fish and Wildlife Service develop the Detroit River International Wildlife Refuge ("the Refuge"), a 48-mile stretch of the Detroit River and Western Lake Erie shorelines. The Refuge was one of the ecosystems harmed by the April 2002 sewer overflow which precipitated the Government's investigation of CESI.

20

The Alliance appears to be a worthy recipient of CESI's community service project contribution, which would make good use of the funds for site cleanup and habitat restoration purposes.

## V.    CONCLUSION AND SENTENCE

The Court imposes sentence on Comprehensive Environmental Solutions, Inc., consisting of: (1) a $600,000 fine; (2) a $150,000 community service project contribution, payable to the International Wildlife Refuge Alliance in Grosse Ile, Michigan; (3) a special assessment of $800, due immediately; and (4) five years of probation.

The conditions and requirements set forth in the parties' September 4, 2008 Plea Agreement apply to this sentence, with the following exceptions:

1.    The first $150,000 installment ($120,000 for the fine and $30,000 for the community service project contribution), is due 120 days after sentencing, to allow the scheduled facilitation between Capital Red Oak Partners, Inc. and Trans National to occur;

2.    The Government may file a judgment lien in the amount of $600,000 against CESI's property;

3.    Upon sale of CESI's property and/or assets, the fine and community service project contribution will accelerate, becoming due immediately and in full; and

4.    All other requirements of the Plea Agreement, including conditions on probation, will remain in effect as long as CESI exists, to be transferred to the buyer if the company is sold as a business.

**IT IS ORDERED**.

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  June 29, 2009

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on June 29, 2009.

s/Carol A. Pinegar

Deputy Clerk

22